UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARYANN LAM,
     Plaintiff,


     v.                                       CIVIL ACTION NO.
                                                14-14179-NMG

CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration,
     Defendant.


**REPORT AND RECOMMENDATION RE:**
**DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER**
**(DOCKET ENTRY # 20); PLAINTIFF'S MOTION TO REVERSE THE DECISION**
**OF THE COMMISSIONER (DOCKET ENTRY # 16)**

**June 20, 2016**

**BOWLER, U.S.M.J.**

     Pending before this court are cross motions by the parties, plaintiff Maryann Lam ("plaintiff") and defendant Carolyn W. Colvin ("Commissioner"), Acting Commissioner of the Social Security Administration. (Docket Entry # 20). Plaintiff seeks to reverse the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) or remand this action to obtain vocational testimony to address the occupational effect of plaintiff's nonexertional impairments. (Docket Entry ## 16, 16-1). The Commissioner moves for an order to affirm the decision. (Docket Entry # 20). After conducting a hearing on February 2, 2016,

this court took the motions (Docket Entry ## 16 & 20) under advisement.

## PROCEDURAL HISTORY

On November 17, 2011, plaintiff filed an application for a period of disability and disability insurance benefits alleging disability beginning on June 9, 2011. (Docket Entry # 9, Tr. 19). The Social Security Administration ("SSA") denied the application and again on reconsideration. (Docket Entry # 9, Tr. 19). Upon reconsideration, the SSA denied plaintiff's application again on August 28, 2012. (Docket Entry # 9, Tr. 19). Following the denials, plaintiff filed a written request for a hearing in front of an administrative law judge ("ALJ"). (Docket Entry # 9, Tr. 19). The ALJ conducted a hearing on June 25, 2013, at which plaintiff testified and was represented by counsel. (Docket Entry # 9, Tr. 19). On July 11, 2013, the ALJ issued a decision finding plaintiff was not disabled under the Social Security Act, 42 U.S.C. § 405, from June 9, 2011 through July 11, 2013. (Docket Entry # 9-2, Tr. 19, 29).

On September 24, 2014, the Appeals Council denied plaintiff's request for review thereby affirming the ALJ's decision as the final decision. (Docket Entry # 9, Tr. 1-3). On November 17, 2014, plaintiff filed this action against the Commissioner pursuant to 42 U.S.C. § 405(g). (Docket Entry # 1).

## FACTUAL BACKGROUND

I.  Plaintiff's Background and Work History

Plaintiff was 48 years old at the time of the ALJ hearing. (Docket Entry # 9, Tr. 37).  At the time of the hearing, plaintiff was married with children but lived with just her spouse in an apartment in Brockton, Massachusetts.  (Docket Entry # 9, Tr. 37).  Plaintiff has a high school diploma and some skills and vocational training.  (Docket Entry # 9, Tr. 37).  Plaintiff testified at the hearing that she was driving for an "auction" for two to four hours per week which she had been doing for a couple of years.[1]  (Docket Entry # 9, Tr. 37-39).  This job represented plaintiff's only income and she received $70 for one day of work.  (Docket Entry # 9, Tr. 38-39).

The Disability Determination Services of the Massachusetts Rehabilitation Commission ("DDS") referred plaintiff to the office of John Hennessey, Ph.D. ("Dr. Hennessy") to perform a consultative evaluation ("CE").  (Docket Entry # 9, Tr. 440). On August 20, 2012, Dr. Hennessey performed a CE on plaintiff. As set out in his consultative examination report, Dr. Hennessey

---

[1]  Plaintiff's attorney clarified that plaintiff drives the materials, presumably for an auction business.  Plaintiff's attorney explained that, "[S]omeone loads [the materials] up and she takes them from location-to-location."  (Docket Entry # 9, p. 38).

reported that:  (1) plaintiff lives with her husband and dog;
(2) plaintiff cleans up the house; (3) she "works two days a
week driving cars to a car auction"; (4) she drives to medical
appointments; (5) plaintiff does her own grocery shopping; (6)
plaintiff enjoys reading and music; and (7) she visits with her
friends and her friends visit her.  (Docket Entry # 9, Tr. 442).
Dr. Hennessy also noted that plaintiff's "pace, concentration,
attention and focus are well within normal limits," she "is
capable of carrying out and remembering instructions" and she
responds to supervisors, co-workers and job pressures
appropriately when she is employed.  (Docket Entry # 9, Tr.
442).  He further opined that plaintiff had arthritis in both
knees, left ankle, both hands and back, ailments which
restricted her from sitting, standing or walking for extended
periods of time and also determined that plaintiff was able to
"lift her dog who is approximately 12 pounds."  (Docket Entry #
9, Tr. 442).  He also determined that plaintiff was "very
overweight and borderline obese."  (Docket Entry # 9, Tr. 442).
Dr. Hennessy noted that plaintiff's global assessment of
functioning was an 80.  (Docket Entry # 9, Tr. 444).

     At the hearing held on June 25, 2013, plaintiff testified
that she tries "to watch what [she] eat[s]" but that she is
limited because she is only able to "microwave or just make . .
. a fast sandwich."  (Docket Entry # 9, Tr. 44).  In terms of

4

taking care of her house, plaintiff testified that her house is "a mess" because she is "not able to clean." (Docket Entry # 9, Tr. 44). Plaintiff further testified to only being able to do "small loads" of laundry and that she is only able to grocery shop for small amounts of food because of the "pain in [her] back." (Docket Entry # 9, Tr. 44-46).

## II.  Plaintiff's Medical History

### A.  Physical History

At the hearing, plaintiff's counsel stated that plaintiff suffers from diabetes and obesity. (Docket Entry # 9, Tr. 42). She was 5'8" and 290 pounds at the time of the hearing. (Docket Entry # 9, Tr. 42). Plaintiff's attorney further stated that plaintiff experiences pain in her lumbar sacral spine and bilateral knees from degenerative joint disease. (Docket Entry # 9, Tr. 39). He stated that plaintiff has "significant spurring which attacks the patella . . . whenever there is significant movement." (Docket Entry # 9, Tr. 39).

On August 8, 2007, plaintiff had a physical exam with her primary care provider, Benjamin Lightfoot, M.D. ("Dr. Lightfoot"), at which she complained of a sharp pain in her left ankle that was "aggravated by sitting, walking and standing." (Docket Entry # 9, Tr. 342-344). Dr. Lightfoot's exam notes show that plaintiff's "pain is relieved by pain/RX meds and OTC medicines: acetaminophen." (Docket Entry # 9, Tr. 342). His

exam notes also describe how plaintiff's left foot had "no joint deformity, heat, swelling, erythema or effusion [and had] [f]ull range of motion."  (Docket Entry # 9, Tr. 344).

The following month, on September 26, 2007, plaintiff had another exam with Dr. Lightfoot, at which plaintiff complained of pain in her "bilateral hand and left ankle . . . aggravated by standing and walking."  (Docket Entry # 9, Tr. 339).  Dr. Lightfoot noted again that plaintiff's pain is relieved by "OTC medications:  acetaminophen."  (Docket Entry # 9, Tr. 339).  On April 7, 2008, plaintiff was seen in the urgent care department at the Brockton Neighborhood Health Center ("BNHC") by Martha Ayano ("Ayano"), a nurse practitioner.  (Docket Entry # 9, Tr. 335-36).  During this appointment, Ayano reviewed plaintiff's musculoskeletal system and noted plaintiff's left ankle aches, bilateral knee aches, bilateral hand aches and lumbar aches were all moderate and stable.  (Docket Entry # 9, Tr. 335).

On March 19, 2009, plaintiff was seen again by Ayano. (Docket Entry # 9, Tr. 333).  At this visit, plaintiff complained of "occasional pain [in the] joints of [her] hands, knees and ankles that is worse with increase[d] activity." (Docket Entry # 9, Tr. 333).  Plaintiff's physical exam during the appointment showed she had full range of motion and no joint deformity, heat, swelling, erythema or effusion in her hands, knees and feet.  (Docket Entry # 9, Tr. 333).  On July 9, 2009

and January 8, 2010, Dr. Lightfoot noted plaintiff's
osetoarthiritis was under "fair control" and seemed to respond
well to Ultram and sustained release Tylenol.  (Docket Entry #
9, Tr. 323-324, 327).

A year later on January 13, 2011, plaintiff was seen in the
urgent care department at BNHC, this time by Sanjeetha Aella,
M.D. ("Dr. Aella"), who determined plaintiff's left foot was
"normal on inspection, no swelling, no erythema, no tenderness"
and that plaintiff's pain was "most likely from osteoarthritis."
(Docket Entry # 9, Tr. 317).  Dr. Aella's exam notes state that
plaintiff's pain is "most likely from osteoarthritis" and
plaintiff should "continue [taking] tramadol and Tylenol prn for
pain, rest and leg elevation."  (Docket Entry # 9, Tr. 427).

Dr. Lightfoot saw plaintiff on February 4, 2011 for
musculoskeletal pain in her upper lumbar spine, which plaintiff
claimed was aggravated from lifting, moving and walking.
(Docket Entry # 9, Tr. 424).  Dr. Lightfoot's exam notes reflect
that plaintiff's "spine is positive for posterior tenderness
[but] no paravertebral spasm."  (Docket Entry # 9, Tr. 314).
Dr. Lightfoot also noted plaintiff's pain "appears to be
muscular in origin" and plaintiff was not interested in physical
therapy ("PT") or a referral at the time of the visit.  (Docket
Entry # 9, Tr. 315).  Plaintiff's left ankle was also examined
and Dr. Lightfoot reported there was neither effusion nor any

areas of focal tenderness. (Docket Entry # 9, Tr. 314). Dr. Lightfoot further noted that plaintiff's left knee exhibited tenderness but there was "no obvious effusion." (Docket Entry # 9, Tr. 314).

On February 19, 2011, plaintiff had an x-ray of her back and knee, which determined her "disks [sic] appear to be essentially normal [and] [t]here is no acute bone abnormality." (Docket Entry # 9, Tr. 456). The x-ray did show, however, that there was significant degenerative joint disease in plaintiff's lower facets. (Docket Entry # 9, Tr. 456). The x-ray also showed "there is no significant varus or vaigus [sic] deformity" in the right and left knees and "there is a DJD [degenerative joint disease] of the posterior patella" and "spurring of the lateral compartment and [a] mild narrowing of the medial compartment" in plaintiff's right knee. (Docket Entry # 9, Tr. 456).

On March 22, 2011, plaintiff saw Dr. Lightfoot to review the x-ray results. (Docket Entry # 9, Tr. 421). At this appointment, plaintiff reported that her pain was minimal but worsened when standing and that "Tylenol-codeine No.3" is helpful. (Docket Entry # 9, Tr. 421). Dr. Lightfoot's exam notes further show that plaintiff's spine was "negative for posterior tenderness." (Docket Entry # 9, Tr. 421). After this appointment, Dr. Lightfoot drafted a letter to plaintiff's

8

electric company explaining that plaintiff "has osteoarthritis
of both knees and lumbar spine and has difficulty working and
has been unable to afford her electric bill." (Docket Entry #
9, Tr. 423). Dr. Lightfoot requested the electric company to
not shut plaintiff's electricity off and to place plaintiff on a
payment plan. (Docket Entry # 9, Tr. 423).

On May 31, 2011, plaintiff had a follow-up visit with Dr.
Lightfoot during which plaintiff complained that her pain "acts
up a lot when up and about," however, Dr. Lightfoot found
plaintiff's "pain control is adequate with continued maintenance
of function." (Docket Entry # 9, Tr. 419). At this
appointment, plaintiff was not interested in addressing her
obesity problem or any implementation of an exercise plan.
(Docket Entry # 9, Tr. 420).

Plaintiff saw Dr. Lightfoot again on September 19, 2011.
During the appointment, Dr. Lightfoot notes reflect that
plaintiff "insist[ed] she ha[d] a fairly high level of activity
and ha[d] no excessive calorie intake." (Docket Entry # 9, Tr.
307). Plaintiff also stated she "runs around a lot and [she
does not] eat much." (Docket Entry # 9, Tr. 306). Dr.
Lightfoot emphasized that plaintiff needs to pay close attention
to her calorie intake and to exercise. (Docket Entry # 9, Tr.
307). Although plaintiff had obesity issues, Dr. Lightfoot
found that plaintiff's pain control is "adequate with continued

maintenance of function." (Docket Entry # 9, Tr. 307). Dr. Lightfoot also noted that plaintiff has normal range of motion in her knees and a "small amount of crepitus no effusion." (Docket Entry # 9, Tr. 306).

On January 19, 2012, plaintiff had an appointment with Dr. Lightfoot for her diabetes. (Docket Entry # 9, Tr. 415). Dr. Lightfoot found that plaintiff's diabetes was "stable and well controlled on diet." (Docket Entry # 9, Tr. 416). During a physical examination on December 5, 2012, Dr. Lightfoot found that plaintiff's respiratory inspection, auscultation and effort were normal, plaintiff had an "appropriate mood and affect" and her heart showed a "regular rate and rhythm [with] no murmurs, gallops, or rubs." (Docket Entry # 9, Tr. 449).

On August 8, 2012, John Benanti, M.D. ("Dr. Benanti") performed a residual functional capacity ("RFC") assessment on plaintiff. (Docket Entry # 9, Tr. 92). Dr. Benanti determined that plaintiff had exertional limitations including the ability to lift and carry 20 pounds occasionally and ten pounds frequently, to stand and/or walk for about six hours in an eight-hour workday, and to sit for about six hours in an eight-hour workday. (Docket Entry # 9, Tr. 93). Dr. Benanti also determined that plaintiff had postural limitations such as occasionally climbing, stooping, kneeling, crouching, or crawling. (Docket Entry # 9, Tr. 93). Finally, Dr. Benanti

concluded that "the evidence shows that the individual has some limitations in the performance of certain work activities; however, these limitations would not prevent the individual from performing past relevant work as a/an driver." (Docket Entry # 9, Tr. 95).

At the hearing held on June 25, 2013, plaintiff testified to experiencing "sharp" pain in both her back and knees. (Docket Entry # 9, Tr. 41). Plaintiff testified to experiencing this pain when she is "driving and when [she is] sitting or standing for a long period of time." (Docket Entry # 9, Tr. 41). Plaintiff further testified to experiencing this pain after standing for about half an hour and that she elevates her legs to relieve the pain. (Docket Entry # 9, Tr. 42-43). Plaintiff also testified that she wakes up in the morning "sore" and that her pain makes it difficult for her to take care of herself, such as taking a shower or going to the bathroom. (Docket Entry # 9, Tr. 48). Plaintiff testified that she has "to be careful when [she] gets up because sometimes [her pain is] severe enough that [she] can't even move." (Docket Entry # 9, Tr. 48). Plaintiff also testified that her pain fluctuates from day-to-day. (Docket # 9, Tr. 49).

B.  Psychological History

In Dr. Hennessy's August 2012 CE, Dr. Hennessy determined that plaintiff was "oriented in all spheres." (Docket Entry #

9, Tr. 442).  He also reported that plaintiff currently had no
psychotherapy counseling with a mental health professional and
she was not currently taking any psychiatric medications.
(Docket Entry # 9, Tr. 441).  It was also reported that
plaintiff's only history of counseling or psychiatric
hospitalization was when she saw a therapist at South Bay Mental
Health in Brockton for two months in September and October of
2009 for depression and grief counseling.  (Docket Entry # 9,
Tr. 441).  Dr. Hennessy further noted that plaintiff reported
she never had a suicide attempt and was not actively suicidal at
the time of the CE.  (Docket Entry # 9, Tr. 443).  Dr. Hennessy
determined that plaintiff had no psychotic features and that her
"appetite is good, sleep good, energy good, motivation good."
(Docket Entry # 9, Tr. 443).  He concluded that plaintiff had a
mild depressive order not otherwise specified.  (Docket Entry #
9, Tr. 444).  Also in August 2012, the state agency consultant,
Joan Kellerman, Ph.D. ("Dr. Kellerman") declined to gauge
plaintiff's mental impairments as severe, noting that she
"alleges depression" with "no source" and that the "CE now in
[the] file" shows "average intellect, good family support,
social functioning responsible and . . . normal attention, [and]
no evidence of memory issues."  (Tr. 90-91).

## DISCUSSION

## I.  Jurisdiction and Standard of Review

The court has the power to affirm, modify or reverse the
ALJ's decision with or without remanding the case for a hearing.
42 U.S.C. § 405(g).  The ALJ's findings are conclusive if
supported by substantial evidence.  See Richardson v. Perales,
402 U.S. 389, 390 (1971); Seavey v. Barnhart, 276 F.3d 1, 9 (1st
Cir. 2001); Manso-Pizzaro v. Sec'y of Health and Human Servs.,
76 F.3d 15, 16 (1st Cir. 1996).  The ALJ's findings of fact are
not conclusive when they are "derived by ignoring evidence,
misapplying the law, or judging matters entrusted to experts."
Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).  It is the
court's task to determine "whether the final decision is
supported by substantial evidence and whether the correct legal
standard was used."  Seavey v. Barnhart, 276 F.3d at 9.

"[T]he determination of the ultimate question of
disability" as well as determinations regarding conflicts in the
evidence and issues of credibility are for the ALJ, not the
courts.  Rodriguez v. Sec'y of Health and Human Servs.,
647 F.2d 218, 222 (1st Cir. 1981); Seavey v. Barnhart, 276 F.3d
at 9.  Even if the record arguably justifies a different
conclusion, this court must affirm the ALJ's decision as long as
it is supported by substantial evidence.  Rodriguez v. Sec'y of
Health and Human Servs., 819 F.2d 1, 2 (1st Cir. 1987).
"Substantial evidence is more than a scintilla of evidence that

a reasonable person could find sufficient to support the
result." Musto v. Halter, 135 F.Supp.3d 220, 225 (D.Mass.
2001).  If "reviewing the evidence in the record as a whole" a
reasonable mind "could accept it as adequate to support the
Commissioner's conclusion," then substantial evidence exists.
Rodriguez, 647 F.2d at 222.

I.   Disability Determination

        The Social Security Act defines disability as the:

        [I]nability to do any substantial gainful activity by
        reason of any medically determinable physical or mental
        impairment which can be expected to result in death or
        which has lasted or can be expected to last for a
        continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  The impairment must be of such
severity that the claimant "'is not only unable to do [her]
previous work but, considering [her] age, education and work
experience, engage in any other kind of substantial work which
exists in the national economy.'" Deblois v. Sec'y of Health
and Human Servs., 686 F.2d 76, 79 (1st Cir. 1982) (quoting 42
U.S.C. § 423(d)(2)(A)).

        To determine whether a claimant is disabled within the
meaning of the statute, the SSA applies a five-step evaluation
process and considers all of the evidence in the claimant's case
record.  20 C.F.R. §§ 404.1520 & 416.920; see Goodermote v.
Sec'y of Health and Human Servs., 690 F.2d 5, 6 (1st Cir.

1982).  In the first step, the claimant is not disabled if he or
she is currently employed.  See Goodermote, 690 F.2d at 6.  If
the claimant is not employed, the decision maker proceeds to the
second step to evaluate if the claimant has a severe impairment
or combination of impairments.  See id.  A severe impairment or
combination of impairments must meet the durational requirement
and "significantly limit[] your physical ability to do basic
work activities."  20 C.F.R. § 416.909.  If the claimant is not
found to have a severe impairment or combination of impairments,
she is not disabled.  See Goodermote, 690 F.2d at 7.  If the
claimant has a severe impairment or combination of impairments,
then the analysis proceeds to the third step and the ALJ
determines if the claimant's severe impairment or combination of
impairments meets or is medically equivalent to one of the
listed impairments in Appendix 1, Subpart P, Part 404 of the
Code of Federal Regulations.  20 C.F.R. §§ 404.1520 & 416.920;
see Goodermote, 690 F.2d at 7.  If the impairment or combination
of impairments meets or medically equals a listed impairment
then the claimant is disabled.  If not, the analysis proceeds to
step four.  See Goodermote, 690 F.2d at 7.

At step four, the ALJ must determine if the claimant can
perform any of his or her previous relevant work by comparing
the claimant's current RFC with the mental and physical demands
of the claimant's past work.  See Manso-Pizzaro, 76 F.3d at 17.

If the claimant can perform any of her past relevant work, the claimant is not disabled.  See Goodermote, 690 F.2d at 7.  In the first four steps, the burden to provide evidence and to prove an inability to perform past work rests with the claimant. See Manso-Pizzaro, 76 F.3d at 17; Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001) ("applicant has the burden of production and proof at the first four steps of the process").

At step five, if the claimant has successfully satisfied her burden by showing she can no longer perform her past relevant work, the burden shifts to the Commissioner to show the existence of a significant number of jobs in the national economy that the claimant could perform.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g) & 416.960(c); Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987); Goodermote, 690 F.2d at 7; Rosado v. Sec'y of Health and Human Servs., 807 F.2d 292, 294 (1st Cir. 1986).  In making this determination, the ALJ must consider the claimant's RFC, age, education and work experience. 20 C.F.R. §§ 404.1520(g) & 416.920(g).  The claimant is not disabled if jobs the claimant can perform exist in significant numbers in the national economy.  20 C.F.R. §§ 404.1520, 416.920, 404.1545 & 416.945.

III.  ALJ Decision

Before engaging in the five-step disability determination, the ALJ concluded that plaintiff met the insured status

requirements of 42 U.S.C. §§ 216(i), 223(d).  (Docket Entry # 9-2, Tr. 19, 21).  At step one, the ALJ found that plaintiff had not undertaken substantial gainful activity ("SGA") since the disability onset date, noting that plaintiff's minimal work did not rise to the level of SGA.  (Docket Entry # 9-2, Tr. 21).

At step two, the ALJ determined that plaintiff's obesity qualified as a severe impairment.  (Docket Entry # 9-2, Tr. 21). The ALJ identified the following impairments as not qualifying as severe:  "diabetes mellitus, unspecified polyarthopathy or polyarthritis, and mild depressive order NOS . . .."[2]  (Docket Entry # 9-2, Tr. 21-22).  The ALJ declined to characterize plaintiff's polyarthritis as severe, finding plaintiff's musculoskeletal pain to be no "more than a minimal work-related limitation."  (Docket Entry # 9-2, Tr. 22).  In support of this finding, the ALJ referenced x-rays from February 2011 revealing "no acute abnormality in the claimant's lumbosacral spine, mild degenerative joint disease in the bilateral knees and no significant varus or valgus in the knees from a standing perspective."  (Docket Entry # 9-2, Tr. 22).  The ALJ further noted that Tylenol alleviated the pain and plaintiff declined to undertake physical therapy.  (Docket Entry # 9-2, Tr. 22).  The ALJ also considered evidence that plaintiff's pain control was

---

[2]  NOS is an acronym standing for "not otherwise specified."

"adequate with continued maintenance of function." (Docket
Entry # 9-2, Tr. 22). Moreover, the ALJ considered plaintiff's
statements that she "runs around a lot" and maintains a "fairly
high level of activity," despite her pain allegations. (Docket
Entry # 9-2, Tr. 22). Lastly, the ALJ indicated that
plaintiff's medical record did not substantially corroborate the
alleged musculoskeletal impairment. (Docket Entry # 9-2, Tr.
22).

At step three, the ALJ considered the severity of
plaintiff's obesity and found that it did not meet or equal the
impairments defined in Appendix 1, Subpart P, Part 404 of the
Code of Federal Regulations. (Docket Entry # 9-2, Tr. 24).
Prior to assessment under step four, the ALJ determined that
plaintiff had the RFC to perform light work, except that she
could only occasionally climb, stoop, kneel, crouch or crawl.
(Docket Entry # 9-2, Tr. 24). The ALJ did so "[a]fter careful
consideration of the entire record" and in light of those
symptoms which appeared to be reasonably consistent with the
objective medical and non-medical evidence. (Docket Entry # 9-
2, Tr. 24). The ALJ found plaintiff's medically determinable
limitations causally related to her alleged symptoms, however,
the ALJ discounted plaintiff's credibility in assessing the
severity and persistence of her symptoms and the extent to which

18

those symptoms limited her functionality.  (Docket Entry # 9-2, Tr. 25).

Viewing the objective medical evidence in the record, the ALJ considered plaintiff's continuous part-time work over recent years and her pursuit of full-time employment, finding that it supported his RFC conclusion.  (Docket Entry # 9-2, Tr. 25). Further, the ALJ contemplated plaintiff's Tylenol and nutrition management regimen as the only real treatment program, secondary to physician check-ups, pursued by plaintiff in regard to her obesity.[3]  (Docket Entry # 9-2, Tr. 25).  Specifically as to plaintiff's musculoskeletal impairments, the ALJ emphasized the "scant and conservative history of treatment" as supportive of his RFC conclusion and generally inconsistent with plaintiff's allegations.  (Docket Entry # 9-2, Tr. 26).

Next, the ALJ reviewed the subjective evidence, ultimately finding that it buttressed his RFC.  (Docket Entry # 9-2, Tr. 27).  Particularly noteworthy was plaintiff's ability to upkeep her home, prepare food, use public transportation, knit, read, crochet, lift her dog and visit the grocery store, her friends and medical providers.  (Docket Entry # 9-2, Tr. 27).  In light of this evidence, the ALJ determined that plaintiff was not as

---

[3]  The ALJ further clarified that he gave plaintiff "the benefit of the doubt" in considering plaintiff's obesity a severe impairment despite a paucity of corroborative medical evidence on the record.  (Docket Entry # 9-2, Tr. 25).

limited by her symptoms as she alleged.  (Docket Entry # 9-2, Tr. 27).  To the extent that plaintiff's hearing testimony varied the range of activities and limitations enumerated, the ALJ discredited them for lacking reasonably certain objective evidentiary support, also pointing out the lack of evidence to suggest any limitation attributable to plaintiff's medical condition rather than other sources.  (Docket Entry # 9-2, Tr. 27).  The ALJ also referred to plaintiff's part-time employment and pursuit of full-time work as factors "not enhanc[ing] the credibility of her allegations."  (Docket Entry # 9-2, Tr. 27).

The ALJ based his RFC assessment on the record as a whole, but in so doing allotted "great weight" to the RFC assessment conducted by Dr. Benanti at the behest of DDS, because it was consistent with the record.  (Docket Entry # 9-2, Tr. 28).  For the same reasons, the ALJ gave great weight to the opinion of the state agency consultant, Dr. Kellerman, in rejecting the existence of a severe mental impairment.  (Docket Entry # 9-2, Tr. 28).  The ALJ concurred with Dr. Benanti's opinion based on the medical evidence of record that plaintiff was able "to lift and carry 20 pounds occasionally and 10 pounds frequently, to stand and/or walk for about 6 hours in an 8-hour workday, and to

sit for about 6 hours in an 8-hour workday."[4]  (Docket Entry # 9-2, Tr. 28).  Additionally, the ALJ agreed with Dr. Benanti's observation that plaintiff "could occasionally climb, stoop, kneel, crouch, or crawl."  (Docket Entry # 9-2, Tr. 28).  The ALJ also noted that these opinions were made by non-examining state agency doctors.  (Docket Entry # 9-2, Tr. 28).

Proceeding to step four, the ALJ found that the RFC of plaintiff allowed her to perform her past relevant work as a laborer and driver at the SGA level.  (Docket Entry # 9-2, Tr. 28).  In the ALJ's estimation, plaintiff's RFC enabled her to meet the physical and mental demands of working as a laborer and driver.  (Docket Entry # 9-2, Tr. 28).  As to step five, the ALJ stated that, in the alternative, plaintiff's RFC would allow her to do other work.  (Docket Entry # 9-2, Tr. 28).  The ALJ utilized the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 ("the Grid") in finding that plaintiff "can perform all or substantially all of the exertional demands at the light level of exertion."  (Docket Entry # 9-2, Tr. 28).  The ALJ did not use a vocational expert ("VE").  (Docket Entry # 9-2, Tr. 28).  In light of the foregoing, the ALJ found plaintiff not disabled.  (Docket Entry # 9-2, Tr. 29).

---

[4]  The ALJ pointed out that, "No treating or examining source has identified greater physical or mental limitations than I have found."  (Docket Entry # 9-2, Tr. 28.)

IV.   Plaintiff's Arguments

Plaintiff initially contends that the ALJ improperly failed to classify the nonexertional impairments of degenerative joint disease and bilateral osteoarthritis in her spine and knees as severe.  (Docket Entry # 16-1, p. 8).  Second, plaintiff implicitly challenges the ALJ's RFC.  She emphasizes that the ALJ failed to properly develop the record by addressing and considering the occupational restrictions posed by these nonexertional limitations, namely, elevating plaintiff's legs as well as lifting, standing and walking with respect to plaintiff's ability to perform her past relevant work as a driver.  (Docket Entry # 16-1, pp. 6, 8).  Lastly, plaintiff argues that the ALJ erred by failing to develop the record by using a VE to assess the impact of plaintiff's nonexertional limitations on plaintiff's ability to perform her past work at step four as well as the availability of other jobs at step five.  (Docket Entry # 16-1, p. 8).

A.   Failure to Classify Nonexertional and Musculoskeletal Impairments as Severe

Plaintiff maintains that, "the ALJ failed to develop the record by not properly addressing relevant severe impairments affecting the plaintiff's ability to engage in gainful activity to include her degenerative joint disease and bone spurring." (Docket Entry # 16-1, p. 8).  Plaintiff submits that the ALJ

22

failed to address her need to rest and elevate her legs and that her degenerative joint disease and bone spurring impaired her ability to lift, stand and walk.

The standard to establish a severe impairment at step two is not rigorous.  In fact, it amounts to no more than "a de minimis test, designed to 'screen out groundless claims.'" Hines v. Astrue, 2012 WL 2752192, at *9 (D.N.H. July 9, 2012) (quoting McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1123 (1st Cir. 1986)).  Step two requires the claimant to make "a reasonable threshold showing that the impairment is one which could conceivably keep him or her from working." McDonald v. Sec'y of Health & Human Servs., 795 F.2d at 1122.  The plaintiff bears the burden of proving that an alleged impairment is, in fact, severe through the use of medical evidence.  See 20 C.F.R. § 404.1512(c) (plaintiff must provide evidence to show impairment is severe and affects functioning).

A "severe impairment" is an impairment "which significantly limits [the claimant's] physical or mental capacity to do basic work activities."  20 C.F.R. §§ 404.1520(c), 416.920(c). Conversely, "An impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] your physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1521(a), 416.921(a).  "The severity requirement cannot be satisfied when medical evidence shows that the person

has the ability to perform basic work activities." SSR 85-28,

1985 WL 56856, at *1 (S.S.A. 1985). As explained in SSR 85-28:

> [a]n impairment or combination of impairments is found "not
> severe" and a finding of "not disabled" is made at this
> step when medical evidence establishes only a slight
> abnormality or a combination of slight abnormalities which
> would have no more than a minimal effect on an individual's
> ability to work even if the individual's age, education, or
> work experience were specifically considered (i.e., the
> person's impairment(s) has no more than a minimal effect on
> his or her physical or mental ability(ies) to perform basic
> work activities).

SSR 85-28, 1985 WL 56856, at *1 (S.S.A. 1985); accord Martinez-

Lopez v. Colvin, 54 F.Supp.3d 122, 129-30 (D.Mass. 2014). Basic

work activities consist of an ability and aptitude "necessary to

do most jobs" such as the physical functions of "walking,

standing, sitting [and] lifting." 20 C.F.R. §§ 404.1521,

416.921; Gonzalez-Ayala v. Sec'y of Health and Human Servs., 807

F.2d 255, 256 (1st Cir. 1986) (ALJ used "correct definitional

framework for determining" severity, "i.e., whether the

impairment or combination of impairments significantly limited

the claimant's ability to perform basic work activities

such as walking, standing, sitting, lifting or carrying").

Notwithstanding plaintiff's assertion that the ALJ failed

to properly address her need to rest and elevate her legs and

include her degenerative joint disease and bone spurring as

severe impairments, the record provides substantial evidence to

conclude that her musculoskeletal impairments were not severe.

The Commissioner correctly articulates Dr. Lightfoot's findings and identifies evidence in the record (Docket Entry # 21, p. 10) which discounts plaintiff's severity argument.  Added to this evidence are the findings by Dr. Benanti who determined that plaintiff could stand and/or walk and sit for six hours in an eight-hour workday, with the occasional ability to climb, stoop, kneel, crouch and crawl.  (Tr. 93).  Dr. Benanti further specified that plaintiff was capable of lifting and carrying 20 pounds occasionally and ten pounds frequently.  The ALJ afforded Dr. Benanti's opinion "great weight."  (Docket Entry # 9-2, Tr. 28).

Furthermore, the medical record showed that plaintiff maintained normal range of motion in her ankle and knees and no joint deformity, swelling, effusion, or valgus in the knees. (Tr. 306, 312, 314, 330, 340, 344, 383).  Tylenol diminished any pain associated with plaintiff's lower extremities (Tr. 306, 313, 324, 421, 339), which at worst was categorized as minimal-to-moderate, but could be worse when standing.  (Tr. 421).  In fact, as recently as September 19, 2011, plaintiff indicated that she "runs around a lot" and maintains a "fairly high level of activity."  (Tr. 22, 306).  Consequently, the ALJ decided that plaintiff suffered musculoskeletal pain that neither "caused the claimant more than a minimal work-related limitation" nor rose to the level of a severe impairment.

(Docket Entry # 9-2, Tr. 22-23).  In sum, the record is replete with evidence that plaintiff's musculoskeletal limitations and need to rest and elevate her legs did no more than minimally limit plaintiff's ability to perform basic work activities. Accordingly, the ALJ's review of these facts and his decision to deem plaintiff's nonexertional, musculoskeletal limitations non-severe is supported by substantial evidence.

B.   Failure to Address and Consider Nonexertional Limitations

As noted previously, plaintiff impliedly challenges the RFC assessment and argues that the ALJ failed to properly develop the record by addressing and considering the occupational restrictions posed by plaintiff's nonexertional limitations, namely, elevating plaintiff's legs as well as lifting, standing and walking, in plaintiff's ability to perform her past relevant work.[5]  Contrary to plaintiff's argument, the ALJ considered that plaintiff's "symptoms are exacerbated by prolonged sitting or standing, and somewhat reduced by elevation and medication." (Docket Entry # 9-2, Tr. 25).  The ALJ however rejected plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms."  (Docket Entry # 9-2,

---

[5]   Nonexertional limitations are defined as "[l]imitations or restrictions which affect your ability to meet the demands of jobs other than the strength demands, that is, demands other than sitting, standing, walking, lifting carrying, pushing or pulling, are considered non-exertional."  20 C.F.R. § 404.1569(a).

Tr. 25).  He explained, correctly, that she "has received very minimal treatment for her alleged musculoskeletal impairments, and this treatment has been entirely conservative in nature, focusing on Tylenol use." (Docket Entry # 9-2, Tr. 26).  In addition, the ALJ commented on plaintiff's failure to seek surgery, "injection therapy, or even a consistent prescription for narcotic pain medication." (Docket Entry # 9-2, Tr. 26).

It is the prerogative of the ALJ to resolve conflicts and credibility issues in the record when supported by substantial evidence.  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d at 222; see Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) (ALJ's credibility determination "entitled to deference" when supported by substantial evidence); Blyther v. Chater, 931 F.Supp. 60, 67 (D.Mass. 1996) (recognizing that substantial evidence supports ALJ's credibility determination when based on medical opinion and treatment options).  The record provides substantial evidence for the ALJ's findings.  As aptly noted by the ALJ, plaintiff declined several treatment options, instead espousing a conservative treatment approach centered on Tylenol use. (Docket Entry # 9-2, Tr. 26).  In reviewing the medical record, the ALJ found that plaintiff maintained normal ranges of motion in her ankle and knees which were otherwise devoid of joint deformity, swelling, effusion or valgus. (Tr. 306, 312, 314,

330, 340, 344, 383).  These considerations were aided by
repeated suggestions in the medical record that Tylenol, in
addition to or in place of other prescribed pain relievers,
managed plaintiff's pain (Tr. 306, 313, 324, 421, 339), which
otherwise tended to be mild.  (Tr. 421).  The ALJ considered
this assessment consistent with the array of plaintiff's daily
activities in upkeeping her home, preparing food, using public
transportation, knitting, reading, crocheting, lifting her dog
and visiting the grocery store, her friends and medical
providers.  (Docket Entry # 9-2, Tr. 22, 25, 27).  Further, the
ALJ factored in plaintiff's ongoing part-time work and ability
to work full-time at the onset of her symptoms.  (Tr. 25, 186-
96).

     In addition, the ALJ afforded great weight to Dr. Benanti's
opinion.  That opinion identified plaintiff's ability to stand
and/or walk and sit for six hours in an eight-hour workday, with
the occasional ability to climb, stoop, kneel, crouch and crawl.
(Docket Entry # 9-2, Tr. 28, 93).  An RFC assessment prepared by
a non-examining, non-testifying physician is entitled to
evidentiary weight dependent on "the nature of the illness and
the information provided by the expert." Rodriguez v. Sec'y of
Health & Human Servs., 647 F.2d at 223.  The findings of a non-
examining physician may constitute substantial evidence when the
report includes more than "brief conclusory statements or the

mere checking of boxes denoting levels of residual functional capacity" and indicates "some care" in reviewing the medical file. <u>Berrios Lopez v. Sec'y of Health & Human Servs.</u>, 951 F.2d 427, 431 (1st Cir. 1991). As explained in the relevant regulations, "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. § 404.1527(c)(3), (e); 20 C.F.R. § 416.927(c)(3), (e). "Furthermore, because nonexamining sources have no examining or treating relationship with [the claimant], the weight" given to "their opinions will depend on the degree to which they provide supporting explanations for their opinions" and "the degree to which these opinions consider all of the pertinent evidence . . .." 20 C.F.R. § 404.1527(c)(3), (e); 20 C.F.R. § 416.927(c)(3), (e).

Here, the ALJ had substantial evidence to allot the medical opinion of Dr. Benanti "great weight" because the conclusions of that opinion are adequately supported by explanation and grounded in consideration of the relevant evidence. Dr. Benanti's opinion evinces more than a cursory examination of the relevant evidence, clearly assessing the additional medical records provided by plaintiff, namely, the notes of treating physicians indicating some osteoarthritis and treatment with Tylenol. (Tr. 91). In addition, Dr. Benanti provided a relatively detailed explanation to support his RFC assessment,

particularly citing plaintiff's adequate pain management through
"continued maintenance of function." (Tr. 94). Dr. Benanti
regarded plaintiff's functional disabilities as variable and,
based on the reviewed function report, unspecific as to "what
these disabilities might be" save several boxes checked by
plaintiff's physician. (Tr. 94). Lastly, Dr. Benanti
referenced the lack of any imaging study done to corroborate
plaintiff's claims. (Tr. 94). Accordingly, this court finds
that the ALJ permissibly assigned great weight to the report of
Dr. Benanti.

Moreover, the ALJ addressed the incompatibility of
plaintiff's demonstrated abilities with her allegations of
disabling nonexertional limitations, emphasizing her ability "to
prepare light meals, help her husband with household tasks, use
public transportation, shop for groceries, handle finances,
crotchet, knit, spending time with friends, and attend her
medical appointments" in addition to her ability to lift her dog
and work part-time. (Docket Entry # 9-2, Tr. 27). To the
extent that plaintiff's hearing testimony contradicted this
range of activity and functionality, the ALJ discounted it for
lack of objective evidentiary support and lack of certitude in
causally relating plaintiff's degree of limitation to her
medical condition. (Docket Entry # 9-2, Tr. 27). Indeed, the
medical record does not support a finding that plaintiff's RFC

should be further constrained because of a need to elevate her legs and limited ability to stand or walk for extended periods.

The ALJ addressed plaintiff's musculoskeletal injuries in depth and concluded that plaintiff suffered no more than, at worst, moderate pain. (Docket Entry # 9-2, Tr. 22). The record supports this conclusion with the doctor's notes repeatedly quantifying plaintiff's pain as mild and amenable to diminution through the use of pain-relieving medications. (Tr. 306, 313, 324, 421, 339). Overall, this court finds the ALJ adequately addressed and considered plaintiff's nonexertional limitations and that substantial evidence supports the ALJ's RFC assessment.

C.   Failure to Obtain Testimony of VE

Plaintiff's contention that the ALJ erred in failing to obtain VE input is misplaced because the ALJ found plaintiff not disabled at step four of the disability determination. VE testimony may be used at step four, but it is not required. See, e.g., Santiago v. Comm'r of Soc. Sec., 1998 WL 161133, at *1 (1st Cir. Mar. 18, 1998); Santos-Martinez v. Sec'y of Health & Human Servs., 1995 WL 275679, at *1 (1st Cir. May 9, 1995) (per curiam);[6] Lewis v. Barnhart, 2005 WL 1923514, at *1 (D.Me. Aug. 9, 2005).

---

[6]   First Circuit Local Rules dictate that a court may cite unpublished opinions "regardless of the date of issuance." First Cir. Local Rule 32.1. A court may consider unpublished

At step four, the ALJ concluded that plaintiff could perform past relevant work as a driver or laborer. (Docket Entry # 9-2, Tr. 28). In contrasting plaintiff's RFC with "the physical and mental demands of this past relevant work," the ALJ found that plaintiff could perform this past relevant work. (Docket Entry # 9-2, Tr. 28). Plaintiff's ability to stand, walk and sit for six hours in an eight-hour workday, with the occasional ability to climb, stoop, kneel, crouch and crawl supports the ALJ's determination that plaintiff could engage in light work with the occasional ability to climb, stoop, kneel, crouch and crawl. (Docket Entry # 9-2, Tr. 28, 93). Plaintiff's ability to perform past relevant work is substantially supported by Dr. Benanti's RFC assessment in addition to plaintiff's ongoing part-time work and her testimony indicating that she could use public transportation, maintain her home, prepare food for herself, make several trips to the grocery store, visit physicians and friends, as well as knit, read and crochet. (Docket Entry # 9-2, Tr. 27). In short, substantial evidence supports the ALJ's step four determination that plaintiff could perform her past relevant work.

Although the ALJ found plaintiff not disabled at step four, the ALJ stated, alternatively, that, "In the absence of this

---

opinions "for their persuasive value but not as binding precedent." First Cir. Local Rule 32.1.

past relevant work," plaintiff could do other work based on a
conclusion that she was not disabled under the Grid.  (Docket
Entry # 9-2, Tr. 28).  Here too, the absence of VE testimony
does not warrant a remand or reversal.  Where, as here, a
claimant's nonexertional limitations are found "to impose no
significant restriction on the range of work a claimant is
exertionally able to perform, reliance on the Grid remains
appropriate."  Ortiz v. Sec'y of Health & Human Servs., 890 F.2d
520, 524 (1ˢᵗ Cir. 1989).  The ALJ found that plaintiff's
nonexertional restrictions did not significantly restrict the
range of work she could perform based on the medical record and
the range of activities plaintiff actually performed despite
allegations of disabling pain.  Substantial evidence supports
the ALJ's findings.  In sum, the ALJ did not err by failing to
obtain VE testimony either at step four or five of the
disability determination.

## CONCLUSION

In accordance with the foregoing discussion, this court
**RECOMMENDS**[7] that plaintiff's motion for an order reversing the

---

[7] Any objections to this Report and Recommendation must be
filed with the Clerk of Court within 14 days of receipt of the
Report and Recommendation to which objection is made and the
basis for any such objection.  See Rule 72(b), Fed. R. Civ. P.
Any party may respond to another party's objections within 14
days after service of the objections.  Failure to file
objections within the specified time waives the right to appeal
the order.

decision of the Commissioner (Docket Entry # 16) be **DENIED** and
that defendant's motion to affirm the Commissioner's decision
(Docket Entry # 20) be **ALLOWED**.

__/s/ Marianne B. Bowler_
**MARIANNE B. BOWLER**
United States Magistrate Judge